# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

                                           Case No. HL 09-10240

RONALD E. MAINS and
SANDRA A. MAINS,

        Debtors.

_____/

## OPINION RE: MOTIONS FOR LEAVE TO APPEAL AND STAY PENDING APPEAL

Ronald and Sandra Mains ("Debtors") have filed a motion for leave to appeal this court's decision to deny confirmation of their Chapter 13 plan. Debtors have also filed a motion to stay further proceedings during the appeal. The court denies both motions.

## PROCEDURAL BACKGROUND[1]

Debtors commenced this bankruptcy proceeding more than a year and a half ago but have yet to confirm a plan. One reason is that Debtors had originally sought relief under Chapter 7. The United States Trustee, though, moved to dismiss their case under Section 707(b)(1)[2] and the court in turn found that Debtors' financial circumstances, when considered as a whole, constituted abuse. *See* 11 U.S.C. § 707(b)(3). However, Debtors avoided having their case dismissed by converting it to one under Chapter 13 instead.

---

[1]The court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and W.D. Mich. LCivR 83.2. This is a core proceeding. 28 U.S.C. §§ 157(b)(2)(B) and (C).

[2]11 U.S.C. § 707(b). Unless otherwise designated, all further references to "Section ____," "Bankruptcy Code," or "Code" shall be to the Bankruptcy Code as currently amended. 11 U.S.C. §§ 101, *et seq.*

Debtors' plan to repay their creditors was first considered last fall.[3] But this time the Chapter 13 Trustee objected because it was not proposed in good faith. The court ultimately denied confirmation after a contested hearing and it is that decision Debtors now wish to appeal.

**FACTS**[4]

Debtors are a retired, married couple. According to Debtors most recently amended schedules, their monthly after-tax income is $6,321.91, with $2,905.00 attributable to social security benefits and $2,845.46 attributable to pensions.[5] As for Debtors' budgeted expenses, the same schedules set their monthly expenditures at $4,982.61. This amount appears excessive for a couple without dependents. One line item that stands out is the $2,039.99 per month Debtors have budgeted for housing.

However, Debtors' expenses have never been an issue, for even at $4,982.66, Debtors still have $1,339.30 per month to pay into their plan. Yet Debtors have proposed payments of only $324.00 per month. The Chapter 13 Trustee objected because the projected dividend to unsecured creditors under such a plan would have been less than 5%.[6] In contrast, the Chapter 13 Trustee

---

[3]Debtors had filed their original Chapter 13 plan on August 30, 2010. However, they amended it on September 21, 2010, as was their right under Section 1323.

[4]The following reflect the court's findings of fact and conclusions of the law made in connection with the February 4, 2011 confirmation hearing.

[5]Debtors' schedules also indicate that Ms. Mains earns another $50.00 per month net of expenses from her door-to-door cosmetics business. The Chapter 13 Trustee did point out at the evidentiary hearing that Debtors' Form B22C filed on November 10, 2010 reported the business's net income at $571.00 per month. However, Debtors claim that this is an error and that Ms. Mains' income from her business is the $50.00 per month reported in her schedules. In any event, the discrepancy was irrelevant to the court's rejection of their plan.

[6]This projection is based upon the thirty-six month plan Debtors proposed. Although not required, Debtors could have proposed a sixty month plan. But even at sixty months the Chapter 13

2

estimated that Debtors could have paid all of their creditors in full in only thirty months had they committed the entire $1,339.30 per month instead.

Debtors nonetheless insist that their plan is proposed in good faith because they believe that the social security benefits they receive should not be taken into consideration. As support, Debtors point to the fact that they were not required to include these benefits for purposes of calculating whether they were contributing all of their disposable income under the so-called "best efforts" test of Section 1325(b).[7] It is Debtors' position, then, that they should not have to add the benefits back in order to establish their good faith under Section 1325(a)(3).

## **DISCUSSION**

### Leave to Appeal

A final order denying confirmation of Debtors' plan has not yet entered. The court instead adjourned the confirmation hearing in order to give Debtors the opportunity to address the good faith issue through a plan amendment. After all, Debtors did not appeal this court's finding that their Chapter 7 case was abusive. Rather, they responded by converting to Chapter 13 and proposing a plan. Therefore, there was reason to believe that they would once again avoid dismissal through a corrective measure.

---

Trustee estimated that payments of only $324.00 would have yielded at most a 30% dividend to unsecured creditors.

[7]A debtor's disposable income under Section 1325(b) is based upon his "current monthly income" which, in turn, excludes from its calculation "benefits received under the Social Security Act." 11 U.S.C. § 101(10A)(B).

Given that Debtors have chosen not to amend, the court will now enter the order denying confirmation of their plan. The court will also enter a separate order dismissing Debtors' case. Consequently, Debtors' motion for leave to appeal is no longer necessary.[8]

<u>Stay of Proceedings Pending Appeal</u>

FED. R. BANKR. P. 8005 governs stays pending appeal. It provides in pertinent part that:

> A motion for a stay of the judgment, order, or decree of a bankruptcy judge, for approval of a supersedeas bond, or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance. Notwithstanding Rule 7062 but subject to the power of the district court and the bankruptcy appellate panel reserved hereinafter, the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest.

Debtors, of course, require no stay with respect to the order denying confirmation of their plan. However, a stay is needed in order to negate the effect dismissal will have upon their case.

Although a stay of proceedings, as opposed to a stay of the order itself, is to be ultimately decided based upon what will best protect the interests of all parties, Debtors must first establish that they are entitled to any stay at all. In deciding such motions, a court is to consider the same factors as it would use to assess a request for injunctive relief. They are:

> (1) whether the defendant has a strong or substantial likelihood of success on the merits; (2) whether the defendant will suffer irreparable harm if the district court proceedings are not stayed; (3)

---

[8]Debtors' April 7, 2011 notice of appeal concerning the court's decision denying confirmation (DN 114) should be sufficient for Debtors to proceed with their appeal. *Cf.* FED. R. BANKR. P. 8002(a).

whether staying the district court proceedings will substantially injure other interested parties; and (4) where the public interest lies.

*Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002) (citations omitted).

Debtors do not contend that they have either a strong or substantial likelihood of succeeding on their appeal. Rather, they argue only "that the issue of a debtor's decision not to commit available social security benefits is a matter of first impression of the Sixth Circuit and courts are split on the issue." Supporting Br., p. 1 (DN 116). In particular, Debtors quote this footnote from the recent Sixth Circuit decision in *Baud v. Carroll*:

> Courts are split on the issue of whether a bankruptcy court may consider an above-median-income debtor's decision to not commit available Social Security benefits to unsecured creditors in the good-faith analysis under 11 U.S.C. § 1325(a)(3). *Cf. Fink v. Thompson (In re Thompson)*, 439 B.R. 140, 142–43 (8th Cir.BAP 2010) (holding that debtors' exclusion of Social Security benefits as source of payment under Chapter 13 plan could not be considered in good-faith analysis), and *Barfknecht*, 378 B.R. at 164 ("[W]hether plan payment must include income derived from Social Security benefits is already specifically addressed elsewhere in the Bankruptcy Code. The trustee's proposed reading of the good faith standard would swallow up these other explicit statutory treatments, effectively rendering them nullities."), with *Bartelini*, 434 B.R. at 297 (holding that a debtor's decision to not commit Social Security benefits to pay unsecured creditors may be "considered as one of many factors under a totality of the circumstances inquiry to determine good faith"), and *Upton*, 363 B.R. at 536 (same). Because the Appellees have chosen to devote Social Security benefits to unsecured creditors, this good-faith issue is not before us today.

634 F.3d 327, 346 n.13 (6th Cir. 2011).

However, the split in decisions recognized in *Baud* is nothing more than a variation of the split that has divided courts since Section 1325(b) was first added in 1984 to address a debtor's good

5

faith in light of his ability to pay.  On the one hand, *Upton*,[9] *Bartelini*,[10] and *Thomas* [11] conform with any number of post- and pre-BAPCPA[12] cases that have continued to include a debtor's ability to pay among the "totality of the circumstances" to be considered in assessing Section 1325(a)(3) good faith.  For instance, one court has said:

> This Court agrees with the intermediate approach.  Thus, the primary measure of whether the debtor has committed sufficient income to the plan is the PDI analysis of § 1325(b).  This means that, in the majority of cases, a debtor need not commit any more funds to pay unsecured creditors than is required by § 1325(b)(1) in order for the plan to be filed in good faith.  But the passage of BAPCPA did not wholly eliminate consideration of a debtor's ability to pay in the context of a good faith analysis under § 1325(a)(3).  In the absence of Tenth Circuit precedent to the contrary, this Court will continue to review plans to determine if the proposed plan constitutes "an abuse

---

[9]*In re Upton*, 363 B.R. 528 (Bankr. S.D. Ohio 2007).

[10]*In re Bartelini*, 434 B.R. 285 (Bankr. N.D.N.Y. 2010).

[11]*Baud* did not cite *In re Thomas*, 443 B.R. 213 (Bankr. N.D. Ga. 2010), although it is a third case that has held that social security benefits are relevant to a court's consideration of a debtor's Section 1325(a)(3) good faith.

> A strong tension exists between a court's consideration of a debtor's retention of SSI in the good faith analysis and the explicit statutory treatment that allows debtors to retain SSI.  *Barfknecht* provides important warnings against a *per se* rule of bad faith for retention of income which would swallow explicit statutory treatment.  *See* 378 B.R. 154, 164 (Bankr. W.D. Tex.2007). The flexibility of the *totality of circumstances* test, however, mitigates concerns about a *per se* rule.  SSI is vital to many Americans because it provides predictable and certain benefits. *See Devilliers*, 358 B.R. at 865–66 (citations omitted).  Nonetheless, SSI is income and a debtor should not be allowed to shield all of that income while paying unsecured creditors nothing.

*Id.* at 219.

[12]Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

of the provisions, purpose or spirit of Chapter 13." For example, a debtor who deducts substantial amounts of secured debt for luxury items on Form 22C may technically comply with § 1325(b), but be unable to demonstrate that a plan offering only minimal or no payments to unsecured creditors was proposed in good faith. On the other hand, the Court would not expect to hear challenges to a debtor's good faith in proposing a plan merely because the debtor could pay an additional $50 in months 49 through 60 of the plan.

*In re Williams*, 394 B.R. 550, 572-73 (Bankr. D. Colo. 2008) (footnotes omitted).[13]

On the other hand, *Barfknecht*[14] and *Thompson*[15] simply reflect the broader themes previously adopted in other post-BAPCPA cases such as *Barr*,[16] *Alexander*,[17] and *Farrar-Johnson*[18] and pre-BAPCPA cases such as *Noreen*[19] and *Zellner*.[20] These courts have interpreted Section 1325(b) as providing a safe harbor from any further inquiry by the court concerning how the debtor's ability to pay reflects upon his good faith. *See, e.g., Farrar-Johnson*, 353 B.R. at 232 ("This kind of good

---

[13]*See, e.g., Pioneer Bank of Longmont v. Rasmussen (In re Rasmussen)*, 888 F.2d 703, 704 (10th Cir. 1989); *550 W. Ina Rd. Trust v. Tucker (In re Tucker)*, 989 F.2d 328, 330 (9th Cir. 1993); *In re Smith*, 286 F.3d 461, 466 (7th Cir. 2002).

[14]*In re Barfknecht*, 378 B.R. 154 (Bankr. W.D. Tex. 2007).

[15]*Fink v. Thompson (In re Thompson)*, 439 B.R. 140 (B.A.P. 8th Cir. 2010).

[16]*In re Barr*, 341 B.R. 181 (Bankr. M.D.N.C. 2006).

[17]*In re Alexander*, 344 B.R. 742 (Bankr. E.D.N.C. 2006).

[18]*In re Farrar-Johnson*, 353 B.R. 224 (Bankr. N.D. Ill. 2006).

[19]*Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir. 1992).

[20]*Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987).

faith objection [i.e., a debtor's ability to pay] has had little or no potency since the 1984 amendment to the Code.").[21]

As for the Sixth Circuit, it has for many years looked at all of the debtor's circumstances in assessing the good faith of his plan. For example, in *Okoreeh-Baah*, it said:

> Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully.
>
> . . .
>
> Accordingly, we hold that *Memphis* did not establish a *per se* rule, and that courts should take into account the totality of the circumstances confronting a debtor, not simply his or her pre-plan conduct, when deciding whether or not to confirm a Chapter 13 plan.

836 F.2d 1030, 1033-34 (6th Cir. 1988) (footnote omitted).

Moreover, the checklist that *Okoreeh-Baah* provided for assessing the debtor's good faith included several ability-to-pay type factors – e.g., the amount of the debtor's income and the debtor's regular and recurring living expenses.[22]

---

[21]*See also In re Smith*, 848 F.2d 813, 820 (7th Cir. 1988); *Keach v. Boyajian (In re Keach)*, 243 B.R. 851 (B.A.P. 1st Cir. 2000).

[22]The complete list is:

> **(a) the amount of income of the debtor and the debtor's spouse from all sources;**
> **(b) the regular and recurring living expenses for the debtor and his dependants;**
> (c) the amount of the attorney's fees to be awarded in the case and paid by the debtor;
> (d) the probable or expected duration of the Chapter 13 plan;
> (e) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;
> **(f) the ability of the debtor to earn and the likelihood of future increase or diminution of earnings;**

The Sixth Circuit also discussed the relationship between Section 1325(b) and 1325(a)(3) in two later cases that have become known as *Caldwell I*[23] and *Caldwell II*.[24] Like *Okoreeh-Baah*, *Caldwell I* adopts a list to evaluate a debtor's Section 1325(a)(3) good faith and that list includes

---

**(g) special situations such as inordinate medical expense, or unusual care required for any member of the debtor's family;**
(h) the frequency with which the debtor has sought relief under any section or title of the Bankruptcy Reform Act or its predecessor's statutes;
(i) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors;
**(j) whether the amount or percentage of payment offered by the particular debtor would operate or be a mockery of honest, hard-working, well-intended debtors who pay a higher percentage of their claims consistent with the purpose and spirit of Chapter 13;**
(k) the burden which the administration of the plan would place on the trustee; and
( l) the salutary rehabilitative provisions of the Bankruptcy Reform Act of 1978 which are to be construed liberally in favor of the debtor.

836 F.2d at 1032 n.3 (citing *In re Kull*, 12 B.R. 654 (S.D. Ga.1981) *aff'd sub nom. In re Kitchens*, 702 F.2d 885 (11th Cir.1983)) (emphasis added).

[23]*Hardin v. Caldwell (In re Caldwell)*, 851 F.2d 852 (6th Cir. 1988).

[24]*Hardin v. Caldwell (In re Caldwell)*, 895 F.2d 1123 (6th Cir. 1990).

9

ability-to-pay type factors.[25]   However, this new list is not as important[26] as the source of that list –

*In re Estus*.[27]

Estus, like *Zellner*, was decided by the Eighth Circuit.  Consequently, when that circuit later

decided in *Zellner* that ability-to-pay was no longer relevant to assessing Section 1325(a)(3), it also

rewrote *Estus*' list.  "This section's [1325(b)'s] 'ability to pay' criteria subsumes most of the *Estus*

factors . . . ."  827 F.2d at 1227.  Nonetheless, the Sixth Circuit, in deciding *Caldwell I* more than

---

[25]     **(1) the amount of the proposed payments and the amount of the debtor's surplus;**
**(2) the debtor's employment history, ability to earn and likelihood of future increases in income;**
(3) the probable or expected duration of the plan;
(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
(5) the extent of preferential treatment between classes of creditors;
(6) the extent to which secured claims are modified;
(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;
**(8) the existence of special circumstances such as inordinate medical expenses;**
(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and
(11) the burden which the plan's administration would place upon the trustee.

*Caldwell I*, 851 F.2d at 859 (quoting from *U.S. v. Estus (In re Estus)*, 695 F.2d 311, 317 (8th Cir. 1982) (emphasis added).

*Caldwell I* then added four more factors for good measure.  *Id.* at 859-60.

[26]Indeed, *Caldwell I* said that the two lists "basically are the same."  851 F.2d at 859.

[27]*U.S. v. Estus (In re Estus)*, 695 F.2d 311 (8th Cir. 1982).

10

a year later, ignored *Zellner* and chose instead the *Estus* list as originally written.[28] Therefore, while the Eighth Circuit may have eliminated ability-to-pay factors from its consideration of Section 1325(a)(3) good faith, the Sixth Circuit most certainly has not.

In sum, while *Baud* is correct that the Sixth Circuit has not yet decided what social security benefits should be included for purposes of determining Section 1325(a)(3) good faith, there are a number of Sixth Circuit decisions that indicate what the outcome will likely be. These cases clearly establish that ability to pay remains an important factor in assessing a debtor's good faith under Section 1325(a)(3). As the Sixth Circuit said in *Okoreeh-Baah*:

> We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: **a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources.** The decision should be left simply to the bankruptcy court's common sense and judgment.

836 F.2d at 1033 (emphasis added).

Therefore, this court sees no reason why the Sixth Circuit would not take into consideration all of a debtor's income, including social security benefits, in considering the sincerity of his repayment plan regardless of whether those benefits were included or not under Section1325(b). After all, "Best efforts under 11 U.S.C. § 1325(b), without more, are not enough." *Caldwell II*, 895 F.2d at 1126.

Those courts that have adopted the safe harbor approach to Section 1325(b) and a debtor's ability to pay also ignore how courts have addressed similar issues in connection with the interplay

---

[28]"Accordingly, we quote with approval the *Estus* list. . . ." *Caldwell I*, 851 F.2d at 859.

between Sections 707(b)(2) and (b)(3). Both of these subsections were added to the Code as part of the 2005 amendments. Their purpose was to give more definition to what Congress meant by "abuse" in what then became Section 707(b)(1).[29] Subsection (b)(2), of course, sets out the so-called means test that underlies the presumption of abuse also included in that subsection. As for subsection (b)(3), it requires the court to give further consideration to the debtor's financial situation even if abuse is not presumed under subsection (b)(2).

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider -
> (A) whether the debtor filed the petition in bad faith; or
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The similarities between these two subsections and Sections 1325(a)(3) and 1325(b) are unmistakable. Each section includes an intentionally vague term – in Section 707(b) it is "abuse" and in Section 1325(a) it is "good faith" – and then complements it with an objective test.[30] Indeed,

---

[29] Section 707(b) had required a finding of "substantial abuse" prior to the 2005 amendments. However, Section 707(b)(1) now requires only a finding of "abuse" and subsections (b)(2) and (b)(3) in turn provide guidance to the court as to when it is to find abuse.

[30] This court recently observed:

> There are many examples throughout the Code of Congress giving definition to an intentionally vague concept by means of example. For instance, Section 1112(b)(4) lists a number of events that would constitute "cause" for either converting or dismissing a Chapter 11 case. Nonetheless, what exactly is meant by that term is left undefined by Section 102(3)'s declaration that the "includes" that precedes the listing of these various events is "not limiting." Therefore, a court is

12

Congress incorporated into Section 1325(b) the very same means test it added to Section 707(b) in the 2005 amendments. And Section 707(b)(3) also uses the same phrase – totality of the circumstances – that the Sixth, Seventh, Ninth, and Tenth Circuits have all used in describing how good faith is to be determined under Section 1325(a)(3).[31]

Given these similarities, one would expect that courts also would be split over whether Section 707(b)(2)'s objective assessment of the debtor's available income precludes further consideration of the same under Section 707(b)(3). However, while some academics have advocated a safe harbor approach,[32] no court has reached this conclusion. Courts instead have uniformly held

---

> still left with the discretion to determine under the particular
> circumstances presented whether some other cause not listed might
> also warrant the case's conversion or dismissal.

*Meoli v. The Huntington Nat'l Bank (In re Teleservices Group, Inc.)* 444 B.R. 767, 833 (Bankr. W.D. Mich. 2011).

The court submits that Congress has in effect employed the same device here. That is, Congress has given further definition to both "abuse" and "good faith" by providing a method to objectively assess the same. However, Congress did not intend either of these tests to supplant "abuse" or "good faith" any more than it intended Section 1112(b)(4)'s list to supplant whatever else might constitute "cause" under that section. To the contrary, Congress intended both "abuse" and "good faith" to still defy precise definition so that the two terms could continue to address what *Okoreeh-Baah* described as "the infinite variety of factors facing any particular debtor." 863 F.2d at 1033.

[31]*See supra* n.11. *See also In re Chaffin*, 816 F.2d 1070, 1074 (5th Cir. 1987); *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986).

[32]Culhane & White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?*, 13 AM. BANKR. INST. L. REV. 665 (2005).

> This paper will respectfully disagree with Judge Wedoff, and argue
> that Congress intended the means test to be the only test of ability to
> pay under the revised Code. With the detailed statutory means test in

that the debtor's ability to pay may still be considered under Section 707(b)(3)'s totality of the

circumstances test notwithstanding the debtor's avoidance of the Section 707(b)(2) presumption.

For example, in *Mestemaker*, the court said:

> In light of the fact that Congress specifically addressed the situation where a debtor has greater expenses and/or lower income than what is accounted for under the means test calculation, it is unreasonable to interpret § 707(b) as not providing for circumstances where a debtor has fewer expenses and/or higher income than what is set forth under the means test. The plain language of § 707(b)(3) provides for a court to consider that very circumstance. . . . **The plain meaning of the phrase "debtor's financial situation" must include a debtor's actual income and expenses, since such information is the starting point for any analysis of an individual's financial situation.**

359 B.R. 849, 854 (Bankr. N.D. Ohio 2007) (emphasis added).[33]

If, though, courts are satisfied that a debtor's ability to pay is relevant for purposes of Section

707(a)(3), then without question a debtor's ability to pay must also be included in assessing the

debtor's good faith under Section 1325(a)(3). Otherwise, the whole purpose of Sections 707(b)(2)

and (b)(3) would be defeated. Debtors' situation is a case in point. Remember, Debtors are not

---

> place, "filed in bad faith" and "totality of the circumstances" no longer authorize judges to define ability to pay. Instead, these phrases must be read as limited to serious debtor misconduct.

*Id.* at 666.

[33] *See also In re Henebury*, 361 B.R. 595, 607 (Bankr. S.D. Fla. 2007); *Reed v. Anderson (In re Reed)*, 422 B.R. 214, 231-32 (C.D. Cal. 2009), *In re Goble*, 401 B.R. 261, 274-77 (Bankr. S.D. Ohio 2009), *In re Castellaw*, 401 B.R. 223, 225 n.5 (Bankr. N.D. Tex. 2009); *In re Booker*, 399 B.R. 662, 665-67 (Bankr. W.D. Mo. 2009); *In re Zaporski*, 366 B.R. 758, 770-71 (Bankr. E.D. Mich. 2007); *In re Pfeifer*, 365 B.R. 187 (Bankr. D. Mont. 2007); *In re Schoen*, 2007 WL 643295 (Bankr. D. Kan. 2007); *In re Pak*, 343 B.R. 239 (Bankr. N.D. Cal. 2006); *In re Paret*, 347 B.R. 12 (Bankr. D. Del. 2006); *Stapleton v. Athens (In re Athens)*, 2007 WL 6376132 (Bankr. M.D. Pa. 2007); *In re Smith*, 2009 WL 4262842 (Bankr. N.D. W. Va. 2009).

willing participants in this Chapter 13 proceeding. They would have preferred not paying their creditors at all by keeping their case in Chapter 7. Indeed, the only reason they are proposing to pay even something in a Chapter 13 plan is because the totality of their circumstances, which included consideration of the substantial amount of pension income Debtors receive in addition to their social security benefits, evidenced an abuse of the Chapter 7 process.

Debtors should not, then, be able to turn around and now abuse the Chapter 13 process. There is no question that social security benefits are to be excluded from the objective Section 1325(b) analysis, just as these benefits are to be excluded from the Section 707(b)(2) analysis.[34] However, these benefits, when considered with the rest of Debtors' circumstances, are just as relevant to assessing whether Debtors are proposing "a sincerely intended repayment of pre-petition debt"[35] under Section 1325(a)(3) as they were to assessing whether Debtors' financial situation evidenced abuse under Section 707(b)(3). Or, as the court explained in *Williams*:

> Undoubtedly, it would be helpful to practitioners to articulate an objective test for a good faith analysis based on a debtor's ability to pay more to his unsecured creditors. Unfortunately, good faith will always remain a subjective test. But it should be used only to ferret out those debtors "engaging in subterfuge so blatant as to indicate that they have 'unfairly manipulated the Bankruptcy Code, or otherwise proposed [their] [c]hapter 13 plan in [such] an inequitable manner' [that they] will run afoul of § 1325(a)(3)." **Thus, the best guidance this Court can offer is the old adage of "pigs get fat, but hogs get slaughtered."**

394 B.R. at 573 (emphasis added).

---

[34]Like the calculation of disposable income under Section 1325(b), the means test under Section 707(b)(2) begins with determining the debtor's "current monthly income" and, again, that term excludes social security benefits. *Cf.* 11 U.S.C. § 101(10A)(B).

[35]*Okoreeh-Baah*, 836 F.2d at 1033.

Debtors, of course, argue that they should not be compelled to pay over to their creditors benefits that are clearly to be excepted from a bankruptcy proceeding. 11 U.S.C. § 407. *See also Hildebrand v. Soc. Sec. Admin. (In re Buren)*, 725 F.2d 1080 (6th Cir. 1984). However, Debtors argument is compelling only because they insist that they should also be allowed to use their other available income for their support. Debtors, though, could just as easily support themselves with their social security benefits and then pay 100% to their creditors from their pension income. Indeed, one of the reasons why a court must still be allowed to use its "common sense and judgment"[36] when assessing a particular debtor's circumstances under Section 1325(a)(3) is to prevent such sophistry as this.

The court also rejects any argument that Debtors are entitled to keep their social security benefits as a reserve simply because they are elderly. Debtors failed to establish any special needs as part of the previous Section 707(b) dismissal proceeding and it does not appear that Debtors have suffered any unusual hardship since then. Moreover, if their circumstances were to change, Debtors could have always amended their plan to reduce payments at that time. 11 U.S.C. § 1329(a).

Therefore, this court concludes that Debtors' likelihood of succeeding on appeal is not good in light of *Okoreeh-Baah*, *Caldwell I*, and *Caldwell II*. The court also concludes that imposing a stay will injure creditors more than the absence of one will harm Debtors. In effect, Debtors want even more than the one and a half years that they have already had to hold off their creditors as they now pursue an appeal that is unlikely to succeed. On the other hand, Debtors could have proposed a plan that contributed most, if not all, of their excess income and still have pursued their appeal. Moreover, if they later prevailed they could have then amended their plan to pay to their creditors

---

[36]*Okoreeh-Baah*, 863 F.2d at 1033.

16

the much smaller amount they would prefer. *Cf.* 11 U.S.C. § 1329. Therefore, in comparing the relative harms of imposing a stay, the balance is clearly against Debtors.

## CONCLUSION

For the reasons stated, the court determines that there is insufficient reason to postpone proceeding with the dismissal of Debtors' case. Debtors have been given an opportunity to amend their denied plan to conform with the good faith requirement of Section 1325(a)(3). Debtors, though, have chosen not to do so. Therefore, dismissal is appropriate without further delay.

The court will prepare a separate order consistent with this opinion.

Hon. Jeffrey R. Hughes
United States Bankruptcy Judge

Signed this 25th day of _____ May _____ , 2011
at Grand Rapids, Michigan.